# Exhibit C

Tyler B. Ayres, Bar No. 9200
AYRES LAW FIRM
12339 S. 800 E. Ste. 101
Draper, UT 84020
Phone: (801) 255-5555
*tyler@ayreslawfirm.com*

Daniel M. Baczynski, Bar No. 15530
Baczynski Law, PLLC
12339 S. 800 E. Ste. 101
Draper, UT 84020
Phone: (801) 871-8779
*dan@bskilaw.com*

---

### EIGHTH JUDICIAL DISTRICT COURT
### DUCHESNE COUNTY, STATE OF UTAH

| | |
|---|---|
| **THE ESTATE OF TANNA JO FILLMORE, et al** ) <br><br> **(On behalf of Plaintiffs personally and on behalf of the class)** <br><br> **Plaintiffs,** <br> **v.** <br><br> **DUCHESNE COUNTY, et al.** <br><br> Defendants. | **AMENDED COMPLAINT AND JURY DEMAND** <br><br> Case No:  180800068 <br><br> Judge: Chiara |

**COME NOW,** Plaintiffs, the Estate of Tanna Jo Fillmore, Deceased, by and through Malany Zoumadakis, Personal Representative, and by and through undersigned counsel.  In support of their Complaint against Defendants Duchesne County, Utah ("Duchesne County"), Sheriff David L. Boren ("Boren"), Kennon C. Tubbs, M.D., L.L.C.

1

("Tubbs, L.L.C."), Kennon C. Tubbs, M.D. ("Tubbs"), and Jana Clyde ("Clyde"), Plaintiffs state and allege:

## PRELIMINARY STATEMENT

1.     This is an action for damages brought to redress the depravation, under color of state law, of rights, privileges and immunities secured to Plaintiffs by provisions of the Eighth and Fourteenth Amendments of the United States Constitution, the United States Code, and the laws of the State of Utah.

2.     Plaintiffs allege that while confined to the Duchesne County, Utah Jail ("DCJ"), in the care, custody and control of the Duchesne County, Utah Sheriff's Office, Tanna Jo Fillmore ("Fillmore") was denied timely access to qualified health care personnel and appropriate pharmacotherapy for the treatment of serious medical, mental health, and psychiatric conditions.   As a direct and proximate result of Defendants' disregard of: Fillmore's serious medical/mental health/psychiatric conditions; the clinically indicated drug therapies prescribed by her treating physicians; and normative correctional medical practices – all of which were occasioned by Defendants under color of state law – Fillmore not only experienced severe psychological and emotional trauma, but she died a horrible and preventable death.

3.     Fillmore's injuries are the product of Defendants' collective promulgation, tacit authorization, and/or adherence to departmental/institutional/clinical policies, procedures, practices, and customs that not only contemplate a deliberate and systemic disregard for known, obvious, and excessive risks to prisoner health and safety, but are also very likely to culminate in a de facto delay in or denial of access to qualified

2

medical/mental health personnel for: a) further evaluation; and b) administration of prescription medications – not only for Fillmore, but for the DCJ prisoner population as a whole.  As such, said policies, procedures, practices, and customs are shocking to the conscience and evince the kind of arbitrariness and abuse of power that operate to deprive Plaintiffs and similarly situated prisoners of their constitutional rights.

4.      Said policies, procedures, practices, and customs contemplate a continuing, persistent, and widespread pattern of official misconduct that comprises the moving force behind Plaintiffs' injuries and evidences deliberate indifference to the health and safety of all inmates confined to the PCJ in violation of the Eighth and Fourteenth Amendments of the United States Constitution, the United States Code, and the laws of the State of Utah, giving rise to both federal and state law claims.  Plaintiffs make demand for a jury trial on all claims set forth herein.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over all civil matters occurring in the State of Utah pursuant to Utah Code § 78A-5-102(1).

6.      Venue is proper because the cause of action arose in Duchesne County, State of Utah.

7.      Defendants are subject to personal jurisdiction within the State of Utah.

8.      Relative to their state law claims, Plaintiffs have complied with the statutory notice requirements mandated by Utah Code Ann. § 63G-7-401 et seq. (West 2018).

## PARTIES

9.      Decedent, Tanna Jo Fillmore ("Fillmore") was a citizen of the United States and was, at all relevant times, domiciled in Salt Lake City, Salt Lake County, Utah. At the time of the events that gave rise to Plaintiffs' claims, Fillmore was confined to the Duchesne County Jail ("DCJ") in Duchesne, Duchesne County, Utah, where she died in custody on November 24, 2016, at age 25.

10.     Fillmore died intestate.  Pursuant to Letters of Administration and Order Appointing Administrator issued by the Third Judicial District Court, Probate Department of Salt Lake County, Utah, Plaintiff Melany Zoumadakis ("Zoumadakis"), Fillmore's natural mother, is the duly appointed Administrator of the Estate of Tanna Jo Fillmore and authorized to bring the claims set forth herein.  Zoumadakis, a duly licensed Registered Nurse (R.N., B.S.N.), is a citizen of the United States and domiciled in Salt Lake County, Utah.

11.     Defendant Duchesne County, Utah ("Duchesne County") is a duly organized political subdivision of the State of Utah.  Upon information and belief, Duchesne County not only maintains a Sheriff's Office, administered by an elected Sheriff, but it is also served by, *inter alia*: a Board of Commissioners, an elected body vested with final decision-making authority over departmental budgets, including that of the Sheriff's Office; and a County Counselor/Attorney, an elected official who provides legal advice to elected officials and county law enforcement agencies, including the Sheriff and the Sheriff's Office.

12.     Defendant David L. Boren ("Boren") is a citizen of the United States, domiciled in Duchesne County, Utah, who, at all relevant times contemplated herein, has

4

served as the duly elected Sheriff of Duchesne County, acting under color of state law. As such, Boren directly and materially participates in county budgetary processes that have a direct impact on, *inter alia*: Duchesne County Sheriff's Office ("DCSO") staffing levels, conditions at the DCJ physical plant, and the provision of health care services at the DCJ. Upon information and belief, Boren also directly and materially participates in the promulgation of DCSO and DCJ policies, procedures, practices and customs and is vested with, directly responsible for, and personally exercises final decision-making authority over, *inter alia*: DCSO supervisory schemes, DCSO training regimens, DCSO personnel job descriptions and duties, and all DCSO policies/procedures – including those that touch and concern the administration and the day-to-day operations of the DCJ. Boren is an agent of both Duchesne County and the DCSO. Plaintiffs bring suit against Defendant Boren in his official capacity.

13.     Defendant Kennon C. Tubbs, M.D., L.L.C. ("Tubbs, L.L.C.") was, at all relevant times contemplated herein, a duly organized for-profit limited liability corporation, operating as a sole proprietorship, and domiciled in Salt Lake County, Utah. Upon information and belief, and while acting under the color of state law, Tubbs, L.L.C. served as the contract entity vested with the duty and authority to provide medical and mental health care services for prisoners confined to the DCJ from approximately July 2002 to January 2017.

14.     Defendant Kennon C. Tubbs, M.D. ("Tubbs") is a citizen of the United States, domiciled in Salt Lake County, Utah, who was, at all relevant times contemplated herein, a duly licensed physician, authorized to practice medicine in the State of Utah, and

Managing Member of/Registered Agent for Defendant Tubbs, L.L.C., a Utah sole proprietorship.  As the Managing Member of Tubbs, L.L.C., Tubbs also served as the Medical Director of the DCJ from approximately July 2001 to January 2017.  Upon information and belief, as Managing Member of Tubbs, L.L.C. and Medical Director of the DCJ, and while acting under color of state law, Tubbs was not only required to ensure that prisoners were able to access medical/mental health services within a reasonable time frame for all medically related conditions, but he was also vested with, directly responsible for, and personally exercised final decision-making authority over, *inter alia*: policies/procedures that touch and concern the provision of medical/mental health care and clinical practices at the DCJ, including the clinical pathways and nursing protocols utilized by medical/nursing personnel.  Plaintiffs bring suit against Defendant Tubbs in both his individual and his representative capacities.

15.     Defendant Jana Clyde ("Clyde") is a citizen of the United States, domiciled in Unitah County, Utah, who was, at all relevant times contemplated herein, a duly licensed LPN (Licensed Practical Nurse) employed by the DCSO and assigned to the DCJ, where she served as the Correctional LPN.  As the Correctional LPN, and while acting under color of state law, Clyde was not only required to, *inter alia*: review and document medical/mental health data collected during booking/intake, evaluate/triage medical service requests submitted by prisoners, and provide nursing care; but she was also required to comply with the Utah Nurse Practice Act and to discharge her duties within the scope of practice authorized by her nursing license.  Plaintiffs bring suit against Clyde in her individual capacity.

6

## GENERAL ALLEGATIONS APPLICABLE TO ALL CLAIMS

16.     The DCJ is a public entity – it is an adult local detention facility with approximately 172 beds, located in Duchesne, Duchesne County, Utah, that is owned, maintained, and operated by Duchesne County.

17.     The DCJ serves multiple regional law enforcement agencies as well as the Utah Department of Corrections ("UDOC") and the Bureau of Indian Affairs ("BIA"), for which it receives both state and federal funds.  As such, it is often filled to capacity or overcrowded.

18.     Defendant Boren was elected to the Office of Sheriff in 2014 and is currently serving a four (4) year term.  Boren is an agent of both Duchesne County and the DCSO.

19.     The DCSO official Position Description for the Duchesne County Sheriff ("Sheriff Position Description") ratified by the Sheriff and the DCSO states, in relevant part: "The Sheriff's statutory duties shall be performed in accordance with §17 Chapter 22 §2 UCA."

20.     Pursuant to UCA §17-22-2, and as the chief elected law enforcement official of the county, the Sheriff's statutory mandate requires him to, *inter alia*, "take charge of and keep the county jail and the jail prisoners[.]"

21.     The Sheriff Position Description also states, in relevant part, that the Sheriff: "Acts as the county jail's warden; [and is] accountable for the custody and care of prisoners[.]"

22.     The Sheriff Position Description also states, in relevant part that the Sheriff must: a) utilize the "Duchesne County Sheriff's Office Manual for which the Sheriff creates and updates[;]" b) "[d]evelop procedures and guidelines[;]" and c) "ensure compliance with organizational policies[.]"

23.     The "Duchesne County Sheriff's Office Manual" – which the Sheriff is required to "create and update" – comprises DCSO "procedures and guidelines," "organizational policies," and separate chapters/sections/titles/provisions of the same that outline, *inter alia*: a) staffing and supervisory schemes for personnel assigned to the DCJ; b) training regimens for DCSO personnel assigned to the DCJ; c) job/position descriptions and duties for commissioned and non-commissioned personnel assigned to the DCJ; and d) access to/provision of medical/mental health services at the DCJ.

24.     Every aspect of the DCJ's management and day-to-day operations are governed by an array of: a) written directives (which include the "Duchesne County Sheriff's Manual," DCSO "procedures and guidelines," DCSO "organizational policies," DCSO position descriptions, and services/staffing plans mandated by DCJ health care provider contracts); and b) unwritten practices and customs.

25.     Said DCSO/DCJ policies, procedures, practices, and customs extend to, are observed by, and impose duties on all commissioned personnel, non-commissioned personnel, and contract personnel assigned to the DCJ

26.     Said DCSO/DCJ policies, procedures, practices, and customs – including those that touch and concern health care delivery and access to medical/mental health

services – are not implemented, given effect, enforced, and/or observed unless or until they are expressly authorized or tacitly ratified by the Sheriff or his designee.

27.     The DCSO/DCJ policies/procedures state, in relevant part, that: "[t]he potential for liability as a result of harm suffered by a prisoner due to a failure of the jail's Health Care system to provide adequate access to Health Care justifies the development of comprehensive policies and procedures[;]" and that "[t]o accomplish the necessary access, the procedures applicable to medical providers, Correctional staff and inmates need to be articulated" and "clearly outlined."

28.     The DCSO/DCJ policies/procedures also state, in relevant part: "The policies and procedures governing Health Care services for prisoners shall include, but not be limited to [r]equired access to Health Care services . . . [r]esponsibilities for various components of the Health Care services delivery system . . . [and] [a]dministration of treatment[.]"

29.     Like all DCSO/DCJ policies/procedures, those that pertain to the provision of/access to medical/mental health services not only comprise part of the "Duchesne County Sheriff's Office Manual," which Boren is required to "create and update," but they also contemplate "procedures and guidelines" he is required to develop and "organizational policies" he is required to enforce.

30.     The DCSO/DCJ policies/procedures also state, in relevant part: "Duchesne County Jail shall designate a qualified Health Care Professional or Health Care Provider with the responsibility and authority to administer the health care of prisoners."

31.     In accordance with the same, Duchesne County and the DCJ contracted Defendant Tubbs, L.L.C. to provide primary medical/mental health services for prisoners from approximately 2002 to 2017 – during which time, Tubbs, L.L.C./Tubbs were the only entities/individuals so contracted.

32.     Tubbs, L.L.C. is a sole proprietorship and the corporate alter-ego of Defendant Tubbs.  Tubbs is the Managing Member of and Registered Agent for Tubbs, L.L.C.

33.     On or about March 15, 2015, Duchesne County entered into an "Agreement" ("DCJ/Tubbs Contract") with Tubbs, L.L.C. and Tubbs.  Said contract, which expressly designated Tubbs the Medical Director of the DCJ, was: a) negotiated by Boren on behalf of the DCSO and Duchesne County; b) drafted by the Duchesne County Counselor/Attorney, at the behest of the Duchesne County Commission; c) executed by all three (3) Duchesne County Commissioners then in office; and d) ratified by a unanimous vote of the same.

34.     In early 2016, by another unanimous vote of the Duchesne County Commission, Duchesne County extended the DCJ/Tubbs Contract through 2017.

35.     The stated purpose of the DCJ/Tubbs Contract was to provide for the routine and emergency medical needs of prisoners confined to the DCJ.  As such, the prisoners were the intended beneficiaries of said Contract.

36.     By operation of DCSO/DCJ policies/procedures and the express terms of the DCJ/Tubbs Contract, Tubbs, L.L.C./Tubbs were, *inter alia*: a) vested with the "responsibility and authority to administer the Health care of prisoners;" and b) required

to "provide both medical and mental health services in a primary care scope of practice to appropriately triage, diagnose, render treatment plan, and prescribe appropriate cost effective medications."

37.    The DCJ/Tubbs Contract states, in relevant part, that: a) Tubbs, L.L.C./Tubbs "shall provide telephone on call service for consultation with the intent to triage inmates for appropriate medical care[;]" b) "[s]ick call will be held once a week[,]" on Thursdays; and c) "Duchesne [County Jail] will employ a nurse to assist with sick call."

38.    The DCJ/Tubbs Contract also states, in relevant part that: Tubbs, L.L.C./Tubbs: a) "will provide training, instruction, support and a supervisory role of nursing staff on how to handle triage, sick call, medical protocols, and health care complaints/grievances[;]" and b) "provide training to nursing staff to maintain quality of care."

39.    The DCJ/Tubbs Contract also states, in relevant part, that Tubbs, L.L.C./Tubbs: a) "will work with local mental health therapists and counselors to provided [sic] oversight in mental health care and treatment[;]" b) "shall work to improve mental health care in the [DCJ] and treat mental illness within the [National Commission on Correctional Health Care (NCCHC) Standards;]" and that c) "[m]ental health medications will be reviewed[] and approved or substitutions where appropriate will be prescribed."

40.    The DCJ/Tubbs Contract also states, in relevant part, that: "[Tubbs, L.L.C./Tubbs] will not provide counseling services."

41.    The DCJ/Tubbs Contract also states, in relevant part, that: "No elective care will be provided without prior authorization by Duchesne [County Jail]."

42.     The staffing plan outlined in the DCJ/Tubbs Contract did not require Tubbs, L.L.C./Tubbs to provide nursing staff or nursing services, but it did require the scheduling of a physician/physician assistant to conduct sick call every Thursday and to "provide telephone on call service[.]"

43.     Aside from the physician/physician assistant assigned to the Thursday sick call, no other Tubbs, L.L.C./Tubbs clinical personnel were contractually required to be on-site at the DCJ any other time during the week.

44.     Tubbs has publicly stated: "I would be willing to provide [clinical staffing] five days a week at a price.  That's just the economics of providing medical care in jails. The sheriff's department has to decide how much they want to invest in how often they want their patients seen.  I'm happy to provide whatever services they want."

45.     In accordance with the express terms of the DCJ/Tubbs Contract, Duchesne County and the DCSO hired/employed one full-time Licensed Practical Nurse ("Corrections LPN") to provide nursing services at the DCJ.  *See*, Paragraph 38, above.

46.     The DCJ/Tubbs Contract reflected a negotiated level of care and clinical services specifically tailored to fit Duchesne County's budget and to comport with DCSO/DCJ policy objectives.  As such, the staffing plan, scope of health care services, and clinical duties outlined therein not only contemplate deliberate policy determinations, but they also comprise DCSO/DCJ policy/procedure relative to health care delivery.

47.     The DCJ/Tubbs Contract – which was negotiated by Boren, the Duchesne County Commission, and Tubbs – also reflects levels of care, staffing, and clinical services that were specifically tailored to fit Duchesne County's budget and to comport

12

with DCSO/DCJ policy objectives.  As such, the staffing plan, scope of health care services, and clinical duties outlined therein not only contemplate deliberate policy determinations, but they also comprise DCSO/DCJ policy/procedure relative to health care delivery.

48.     Clinical pathways are written algorithms that assist physicians in making decisions about appropriate diagnostic services, therapeutic interventions, and treatment plans for specific medical conditions.

49.     Nursing protocols and standing orders are written procedures that instruct nurses what actions to take when presented with specific medical conditions.

50.     As Medical Director of the DCJ, vested with the "responsibility and authority to administer the Health care of prisoners," Tubbs, by and through his corporate alter-ego, Tubbs, L.L.C., personally developed, expressly approved, and/or otherwise tacitly authorized: a) the clinical pathways ("DCJ Clinical Pathways") utilized by Tubbs, L.L.C. medical personnel; and b) the nursing protocols and standing orders ("DCJ Nursing Protocols") utilized by the Corrections LPN.

51.     Said DCJ Clinical Pathways and DCJ Nursing Protocols comprise DCSO/DCJ policy/procedure.

52.     Said DCJ Clinical Pathways and DCJ Nursing Protocols were not adequate to provide for the routine and emergency medical/mental health needs of prisoners in that, *inter alia*, they did not provide sufficient guidance in the assessment/treatment of serious mental health/psychiatric conditions.

13

53.     By design, fiscal necessity, and operation of DCSO/DCJ policies/procedures – including the DCJ/Tubbs Contract staffing plan and the DCJ Nursing Protocols – the provision/administration of health care services at the DCJ was primarily delegated to the Corrections LPN.

54.     In November of 2016, the Corrections LPN was Defendant Jana Clyde ("Clyde").  Clyde, who completed one year of formal training/instruction to become an LPN, was assigned to work at the DCJ forty (40) hours per week.

55.     The DCSO official Position Description for the Corrections LPN ("Corrections LPN Position Description") ratified by the Sheriff and the DCSO states, in relevant part, that the Corrections LPN "will evaluate inmates and provide comprehensive medical care," "will work under the general guidance and direction of [Tubbs, L.L.C. and Tubbs] and the jail administration[,]" and will report to the Corrections Corporal.

56.     The "Essential Functions" listed in the Corrections LPN Position Description include, *inter alia*: a) complying with "medical department rules" and the policies/procedures of the DCSO; b) "[a]ssessing, planning, and delivering nursing care[;]" c) "[c]oordinating multiple medical services for diagnosis and treatment as directed by the physician[;]" and d) "[m]aintaining [a] working knowledge" of both "pharmacology" and "social and behavioral sciences[.]"

57.     At all relevant times contemplated herein, Clyde not only possessed a rudimentary "working knowledge" of both "pharmacology" and "social and behavioral sciences," but she was able to recognize medical/mental health conditions and prescription

14

medications reported by prisoners during their intake health screening that necessitated further clinical assessment by and direction from an advanced practitioner.

58.     Clyde did not, however, have any specialized training in working with mentally ill patients or recognizing symptoms of mental illness.

59.     DCSO/DCJ policies, procedures, practices, and customs – including the DCJ/Tubbs Contract in general and the clinical staffing plan in particular – collectively imposed duties on or otherwise required the Corrections LPN to perform tasks that exceeded the scope of nursing practice authorized for an LPN.

60.     In accordance with DCSO/DCJ policy/procedure, incoming prisoners received a rudimentary intake health screening upon their arrival at the DCJ.

61.     Said intake health screening, comprising yes/no/open-ended subjective questions that DCSO Booking Clerks read to prisoners from computerized booking forms, sought to identify, *inter alia*: a) current medical/mental health conditions; b) significant clinical history; c) current outside treating physicians; and d) current prescription medications.

62.     DCSO Booking Clerks documented the medical/mental health conditions, current treatments, and active prescriptions prisoners reported during their intake health assessments in the DCJ jail management system ("JMS/OMS") and printed a hard-copy/paper version of the same to Clyde, who independently determined whether any further clinical evaluation/ assessment and/or intervention was warranted.

63.     Although the DCJ JMS/OMS had the capability to display clinical data reported by prisoners during the course of prior intake health screenings, it was not used

15

for electronic medical record-keeping purposes.  Prisoner medical files were also maintained in hard-copy/paper format.

64.     Neither Tubbs, L.L.C./Tubbs personnel nor Clyde were required to obtain, review, or otherwise utilize off-site medical/mental health records to confirm diagnoses and/or verify active prescriptions reported by prisoners.  As a result, the clinical data collected during booking and intake was routinely disregarded or ignored.

65.     DCSO/DCJ policies/procedures state, in relevant part: a) "[m]edical treatments and therapies ordered for inmates by physicians who are not DCJ medical providers shall be considered recommendations[;]" and b) "[p]hysicians who are not DCJ Medical Providers who order treatment for inmates shall be viewed as consultants[.]"

66.     Said DCSO/DCJ policies/procedures vested Tubbs, L.L.C./Tubbs personnel with the clinical fiat to "countermand" or otherwise discontinue treatments and therapies ordered by outside medical/mental health providers if, *inter alia*, Tubbs: a) "d[id] not have the capacity to provide the treatment or therapy ordered;" or b) "prefer[red] an alternative method of treatment or therapy to the one ordered."

67.     Said DCSO/DCJ policies/procedures, as well as clinical practices and customs observed at the DCJ, dictated that non-emergent medical/mental health conditions requiring assessment/treatment that could not be conducted/provided on-site, or that otherwise exceeded a primary scope of practice, were typically deemed "elective care" – which necessitated "prior authorization by Duchesne [County Jail]."  *See*, Paragraphs 37 and 42, above.

68.     No qualified mental health personnel (psychiatrists/psychologists), mental health staff (psychiatric social workers/nurses), or clinicians with specialty training in the diagnosis and treatment of mental health conditions were assigned to the DCJ in 2016.

69.     Despite the provisions of the DCJ/Tubbs Contract to the contrary, no mental health services or psychiatric care were provided on-site at the DCJ.

70.     Said services/care – the provision of which necessarily exceed the primary scope of practice contemplated by the DCJ/Tubbs Contract – were considered "elective care," which, by operation of DCSO/DCJ policy/procedure, required an off-site specialty referral from Tubbs, L.L.C./Tubbs and prior authorization of the DCSO/DCJ.

71.     As "elective care," the established practice and custom among DCJ clinical personnel was to delay treatment for mental health conditions unless or until they became emergent or otherwise provide no treatment at all.

72.     Tubbs is a member of the National Commission on Correctional Health Care ("NCCHC"), through which he is also credentialed as a Certified Correctional Health Professional – Physician (CCHP-P).

73.     During his tenure as DCJ Medical Director, Tubbs and Tubbs, L.L.C have been named in myriad prisoner grievances and lawsuits complaining of medical/mental health care.

74.     By virtue of Tubbs' NCCHC membership, his CCHP-P certification, and said grievances and lawsuits, Tubbs, L.L.C./Tubbs had actual and/or constructive knowledge of the high incidence of mental health disorders among jail/prison populations, including that of the DCJ, and the necessity of timely and adequate access to mental health

17

care.  Mental health topics on which he was instructed and tested in the course of obtaining his CCHP-P certification included: "[s]ide effects of psychotropic medications;" "[i]ntoxication and withdrawal management;" and [l]ong term effects of substance abuse."

75.     Tubbs, L.L.C. personnel all maintained memberships and professional affiliations with sundry correctional medical organizations and publications, through which they had actual and/or constructive knowledge of the high incidence of mental health disorders among jail/prison populations and the necessity of timely and adequate access to mental health care.

76.     Boren and the DCJ command staff all maintained memberships and professional affiliations with sundry law enforcement organizations, including the Utah Sheriff's Association.

77.     By virtue of their memberships and affiliations, through which they attended seminars and received publications that discussed correctional health care, and said grievances and lawsuits, Boren and the DCJ command staff had actual and/or constructive knowledge of the high incidence of mental health disorders among correctional populations, including that of the DCJ, and the necessity of timely and adequate access to adequate mental health care.

78.     Having been named in myriad grievances and lawsuits involving the provision of mental health care at the DCJ, and by virtue of the same, Duchesne County, the DCSO, the DCJ, Boren, Tubbs, Tubbs, L.L.C., and Clyde also had actual and/or constructive knowledge of the specific barriers to mental health/psychiatric care at the DCJ and the overall lack of access to qualified mental health personnel.

79. As a matter of course, Tubbs, L.L.C./Tubbs personnel routinely ignored and/or discontinued mental health treatment plans developed by off-site providers as well as the drug therapies prescribed by off-site providers.

80. As a matter of course, Tubbs, L.L.C./Tubbs personnel did not utilize drug therapy in the treatment of certain types of mental health conditions, including anxiety/panic disorders and depressive disorders.

81. As a matter of course, Tubbs, L.L.C./Tubbs personnel seldom referred prisoners for off-site mental health/psychiatric care or sought prior authorization from Boren and the DCSO/DCJ to do so.

82. Having been named in myriad grievances and lawsuits involving the provision of health care at the DCJ, and by virtue of the same, Boren, the DCSO/DCJ, Tubbs, and Tubbs, L.L.C. had actual and/or constructive knowledge of deficiencies in the delivery of mental health services/psychiatric care.

83. Boren, DCSO/DCJ personnel, and Tubbs, L.L.C./Tubbs personnel also constructively discouraged prisoners from seeking mental health care by omitting a category for mental/behavioral health from DCJ "Medical Request" forms:

What do you need? *(Check one)*

Sick Call          Expired Prescription Renewal          Dental Exam          Eye
                                                              Exam

84. During regular business hours, when Clyde was on duty, she functioned as a gatekeeper to Tubbs, L.L.C./Tubbs personnel by: a) evaluating/assessing medical/mental health conditions reported by prisoners or otherwise identified by lay

19

custody staff during the intake health screening; and b) triaging medical requests submitted by prisoners for sick call.

85.     On nights and weekends, when no qualified medical/nursing personnel were on duty, prisoner medical care was delegated to lay custody staff, who also functioned as gatekeepers to Tubbs, L.L.C./Tubbs personnel.   As DCSO/DCJ policies/procedures explain: "officers are the first 'eyes and ears' of [Tubbs, L.L.C./Tubbs,] the Medical Provider."

86.     Both Clyde and lay custody staff periodically delayed and/or refused to fulfill their gatekeeping role relative to the provision of mental health services/psychiatric care by not affording prisoners access to Tubbs, L.L.C./Tubbs personnel.

87.     During Tubbs' tenure as Medical Director, Tubbs L.L.C./Tubbs personnel did not routinely engage in meaningful quality improvement activities and/or utilize adequate audit tools and compliance indicators to a) assess the overall delivery of medical/mental health care at the DCJ; and b) identify areas that need improvement.

88.     During the life of the Tubbs, L.L.C./Tubbs Contract(s), neither Boren nor the DCSO engaged in meaningful contract monitoring activities to ensure that Tubbs, L.L.C./Tubbs fulfilled their contractual obligations and that the DCSO fulfilled its duty to meet the routine and emergency medical/mental health needs of prisoners.

89.     An Anxiety/Panic Disorder is a serious chronic mental health/psychiatric condition – categorized in the Diagnostic and Statistical Manual of Mental Disorders: 5th Edition ("DSM-5") – which is characterized by sudden attacks of fear, apprehension, and/or panic that are frequently triggered by fear-producing events or thoughts.

90.     Post-Traumatic Stress Disorder ("PTSD") is a serious mental health/psychiatric condition – categorized in the DSM-5 – which is caused by a shocking, scary, or dangerous event and characterized by feelings of stress and fear, even when one is not in actual danger.

91.     A Major Depressive Disorder is a serious mental health/psychiatric condition – categorized in the DSM-5 – which is characterized by a persistently depressed mood and/or loss of interest in activities that not only affects how one thinks and feels, sometimes causing one to feel as if life isn't worth living, but it can also cause significant impairment in daily life.

92.     Attention Deficit Hyperactivity Disorder ("ADHD") is a serious chronic mental health/psychiatric condition – categorized in the DSM-5 – characterized by attention difficulty, hyperactivity and impulsiveness, which, in turn, make it difficult for one to pay attention and control impulse behaviors.

93.     At the time of her death, Fillmore suffered from, had been diagnosed with, and was undergoing treatment for myriad serious mental health/psychiatric conditions, including: Anxiety/Panic Disorder, PTSD, Major Depressive Disorder, and ADHD – disabilities which, to varying degrees, impaired her ability to hold a job and to function normally.

94.     On account of the severity of her mental health/psychiatric conditions, Fillmore had also been qualified for and was receiving Social Security Disability Insurance ("SSDI") benefits at the time of her death.  As such, Fillmore was a qualified individual with a disability.

95.     On or about Tuesday, November 15, 2016, Fillmore was arrested in Salt Lake City on a probation violation arising from a misdemeanor drug charge in Duchesne County.  She was initially taken to the Salt Lake County Jail ("SLCJ"), where she was held overnight.

96.     Shortly after Fillmore was arrested, she telephoned her mother, Plaintiff Zoumadakis, who, in turn, contacted Fillmore's Probation Officer, Steve Hooley ("Hooley").  Hooley informed Zoumadakis that Fillmore would be held at the DCJ without bail.

97.     Zoumadakis, a duly licensed Registered Nurse ("RN") with a psychiatric background, advised Hooley that Fillmore was taking two (2) prescription medications, neither of which Fillmore had been allowed to take with her when she was arrested.  She also advised Hooley that neither one of Fillmore's drug therapies could be discontinued altogether without destabilizing Fillmore's mental status and/or causing further injury. Hooley indicated he would apprise the DCJ of Fillmore's prescription medications.

98.     On or about Wednesday, November 16, 2016, Fillmore was extradited from the SLCJ to the DCJ.

99.     When Fillmore arrived at the DCJ, a DCJ Booking Clerk conducted her intake health screening, during the course of which, she reported: a) her current mental health/psychiatric conditions – which included Anxiety/Panic Disorder, PTSD, Major Depressive Disorder, and ADHD; and b) the prescription medications she was taking for those conditions – which included Xanax/Alprazolam for Anxiety/Panic Disorder and D-Amphetamine Sulfate for ADHD.

100.    Since Fillmore had previously been confined to the DCJ on multiple occasions, the mental health/psychiatric conditions she reported during her intake health screen on November 16th were already documented in both the DCJ JMS/OMS and the hard-copy/paper medical records maintained by Tubbs, L.L.C./Tubbs and Clyde.

101.    As a matter of DCJ clinical practice and custom, neither Clyde nor Tubbs, L.L.C./Tubbs personnel were required to participate in, be present for, or contemporaneously review the results of the intake health screening.

102.    After the intake health screening, and, in accordance with DCSO/DCJ policies/procedures, Fillmore was assigned to a cell – without executing a HIPAA release so that clinical personnel could obtain her outside medical/mental health records; without being examined by Clyde; and without being given her prescription medications.

103.    Upon information and belief, Fillmore was not seen by Tubbs, L.L.C./Tubbs personnel during the regular sick call on Thursday, November 17, 2016.

104.    On or about Friday, November 18, 2016, Fillmore telephoned Zoumadakis again and complained that Clyde and correctional staff were still refusing to give Fillmore her medications.  Fillmore also indicated that the public defender said she was facing a fifteen (15) year prison sentence.  During the call, Zoumadakis detected fear and anxiety in her daughter's voice, noting that Fillmore sounded unwell.

105.    After the call, Zoumadakis contacted Hooley again to inform him that as of November 18th, Fillmore was still not getting her medications.  Hooley advised her not to worry and indicated he would contact the DCJ again to apprise the DCSO of mental health/psychiatric needs and to inquire as to Fillmore's well-being.

23

106.    On or about Tuesday, November 22, 2016, Fillmore telephoned Zoumadakis three (3) times throughout the day.   She complained that Clyde and correctional staff were still refusing to fill her medications.   During these calls, Zoumadakis again detected distress in her daughter's voice, noting Fillmore was not in her right mind and that she sounded even more anxious and unwell.

107.    Upon information and belief, Fillmore submitted a "Medical Request" to get her prescriptions filled and, ultimately, had a nurse encounter with Clyde.

108.    Clyde, who knew Fillmore from her previous incarcerations, reviewed Fillmore's current intake health screening prior to the encounter and was aware of Fillmore's psychiatric disorders and drug therapies.

109.    Despite her actual knowledge of the same, Clyde refused to give Fillmore any medication or to otherwise fulfill her gatekeeper role by contacting Tubbs, L.L.C./Tubbs personnel.  Instead, Clyde sent Fillmore back to her cell.  Before she did so, however, Clyde pointedly told her that she would not be getting her psychotropic medications because she was a "drug addict."

110.    On or about Wednesday, November 23, 2016, Fillmore again telephoned Zoumadakis three (3) times throughout the day.  Having gone more than a week without her medications, she was angry with Zoumadakis and begged Zoumadakis to bring her medications to the DCJ.  On the last call, Fillmore yelled at Zoumadakis, threatening to commit suicide, and then hung up.

111.    Immediately after the call, Zoumadakis contacted Hooley again and told him about the distressed phone calls from Fillmore.  She told Hooley that Fillmore hadn't

had her medications since November 15th and that she had threatened to commit suicide. Hooley advised Zoumadakis that Fillmore had been placed in an observation cell and told her not to worry.

112.     Upon information and belief, DCJ practices and customs dictate that non-attorney phone calls made by prisoners are recorded.  As such, the phone calls that Fillmore made to Zoumadakis from the DCJ were recorded and preserved.

113.     Upon further information and belief, correctional staff and other prisoners who were in the proximity of the phone bank at the DCJ overheard Fillmore threaten to commit suicide.

114.     On Thursday, November 24, 2016, at approximately 1:20 p.m., Fillmore was found unresponsive in her cell at the DCJ.  After efforts to revive her failed, she was subsequently pronounced dead.  Fillmore's death was ruled a suicide.  She was twenty-five (25) years-old.

115.     The toxicology results reported by the Medical Examiner were negative for any prescription medications.

116.     Left untreated, Fillmore's mental health/psychiatric co-morbidities were triggered and compounded by the rigors of her confinement, especially a fear that she might be facing a fifteen (15) year prison sentence.  Collectively, her anxiety, fear, and depression fueled more of the same and, ultimately, induced an irrational and manic state of mind that culminated in self-harm.

117. Psychiatric conditions like Fillmore's do not leave anatomical markers that can be detected in the course of an autopsy. As such, pathologists do not routinely report them.

118. There were two (2) suicides at the DCJ between 2013 and 2015: Gary Donald Mecham on February 21, 2013 and Michael Allen Baker on September 22, 2015.

119. Suicide and thoughts of self-harm are indicative of mental illness.

120. Fillmore suffered from unnecessary and wanton infliction of pain because of: a) the clear and deliberate indifference to her serious mental health/psychiatric needs; b) the unwarranted cessation of the course of treatment ordered by her treating physicians before she was remanded to the custody of the DCSO; and c) her exclusion from the benefits of certain health care services by reason of her medical/mental health/psychiatric disorders.

121. Her injuries were the product of Defendants' direct actions/inactions and official policies, procedures, practices, and customs collectively promulgated, tacitly authorized, and/or observed by Defendants.

122. Through their deliberate indifference to Fillmore's serious medical/mental health/psychiatric needs, Defendants collectively subjected her to and engaged in conduct that deprived Fillmore of her constitutional right to be free from cruel and unusual punishment guaranteed by the Eighth Amendment to the United States Constitution as applied to the States through the Fourteenth Amendment.

123. By excluding prisoners who, like Fillmore, are afflicted with serious mental health/psychiatric disorders from the benefits of assessment/treatment for those

26

disorders, Defendants essentially deny them access to the same panoply of clinical interventions available to unafflicted prisoners in contravention of Title II of the ADA. Prisoners with documented diagnoses of high blood pressure received treatment; prisoners with documented diagnoses of mental health/psychiatric disorders did not.

124.    Boren, DCSO/DCJ, and Tubbs, L.L.C./Tubbs' policies, procedures, practices, and customs – which, through the repeated and deliberate conduct and omissions of commissioned, lay, and contract personnel assigned to the DCJ, were so widespread and persistent as to represent official policy – recklessly disregarded substantial risks of serious harm to prisoners, of which Defendants were aware, and inflicted injuries that are actionable under 42 U.S.C. § 1983.

125.    Boren, DCSO/DCJ, and Tubbs, L.L.C./Tubbs' collective abdication of policy-making, oversight, and training responsibilities – coupled with: a) inadequate policies, procedures, practices, customs, and actions/inactions; and/or b) inadequate supervision, training, direction, and control – reached the level of deliberate indifference and precipitated a constitutional injury through the unnecessary and wanton infliction of pain on Fillmore and, ultimately, her suicide.

126.    More specifically, the policies, procedures, practices, customs, and actions/inactions that Duchesne County, Boren, Tubbs, L.L.C., and Tubbs observed and/or tacitly authorized – coupled with their failure to exercise adequate supervision, direction, and remedial control over DCSO/DCJ and Tubbs, L.L.C./Tubbs personnel, including Clyde – gave rise to actionable systemic deficiencies by, *inter alia*:

a.      Failing to provide access to qualified mental health personnel capable of treating prisoners afflicted with serious mental health/psychiatric conditions;

b.      Failing to treat prisoners afflicted with serious mental health/psychiatric conditions or otherwise provide adequate treatment/care for the same;

c.      Forcing prisoners with psychotropic medications prescribed for serious mental health/psychiatric conditions to go cold-turkey, in contravention of prevailing clinical practices;

d.      Branding medical/mental health care that cannot be provided on-site at the DCJ "elective" and subjecting the same to DCSO approval;

e.      Failing to collect, review, and utilize outside clinical records from treating physicians;

f.      Failing to consult, facilitate, and/or implement treatment plans ordered by off-site treating physicians;

g.      Failing to provide prisoners with professional clinical judgment by delegating their care to a single LPN;

h.      Failing to develop, commission, and utilize a clinical staffing plan sufficient to meet the routine and emergency needs of prisoners;

i.      Failing to make and authorize off-site specialty referrals for medical/mental health/psychiatric care in a timely manner;

j.      Failing to assure timely access to qualified clinical personnel;

28

k.      Delegating clinical determinations to a single LPN who is neither qualified nor licensed to independently make such determinations;

l.      Failing to provide adequate clinical supervision for Clyde;

m.      Failing to develop and implement training requirements for correctional staff and Clyde that addressed working with mentally ill prisoners and recognizing basic symptoms of mental illness, including manic episodes;

n.      Failing to assure staff competency, especially among physicians and nurses, including the establishment of policies, procedures, and processes to detect and respond to incompetency;

o.      Failing to conduct meaningful quality improvement activities and/or utilize adequate audit tools and compliance indicators to i) assess the overall delivery of medical/mental health care at the DCJ; and ii) identify areas that need improvement;

p.      Failing to engage in meaningful contract monitoring activities to ensure that Tubbs, L.L.C./Tubbs fulfilled their contractual obligations and that the DCSO fulfilled its duty to meet the routine and emergency medical/mental health needs of prisoners;

q.      Failing to utilize an adequate medical/mental health record-keeping system instead of maintaining some on the DCJ JMS/OMS and others in hard-copy/paper format;

r.      Failing to devote sufficient fiscal resources to medical/mental health care for DCF prisoners and elevating cost over care; and

29

   s.  Failing to provide prisoners afflicted with mental health/psychiatric disorders the same panoply of health care services available to other prisoners.

  127. The nineteen (19) systemic deficiencies outlined in Paragraph 127, above, are the product of official policies, procedures, practices, customs, and actions that were promulgated or tacitly authorized by Duchesne County, DCSO/DCJ, and Tubbs, L.L.C./Tubbs personnel who were vested with final decision-making authority in like matters – and all nineteen (19) caused or materially contributed to: a) the systemic and deliberate indifference to Fillmore's constitutional right to be free from cruel and unusual punishment; and the unnecessary and wanton infliction of pain she experienced.

  128. Duchesne County, Boren, Tubbs, L.L.C., and Tubbs' official policies, procedures, practices, customs, and actions/inactions, which comprise the moving force behind Plaintiffs Fillmore and Zoumadakis' injuries – as specifically set forth in Paragraph 145 and 146, below – operated to deprive Fillmore of the right to adequate and clinically appropriate assessment and treatment of her serious mental health/psychiatric conditions, and, but for the same, she would not have been deprived of rights secured by the Eighth and Fourteenth Amendments to the United States Constitution, the United States Code, and the State of Utah.

  129. Collectively, Duchesne County, Boren, Tubbs, L.L.C., Tubbs, and Clyde's acts and omissions not only contemplate a conscious disregard of a substantial risk of serious harm to prisoner health and safety – which Defendants knew were highly likely to occasion constitutional violations – but said acts and omissions are also sufficiently harmful to evidence deliberate indifference to the serious medical/mental

health/psychiatric conditions of the inmates of the inmates in their charge, including Fillmore.

130.    Duchesne County, Boren, Tubbs, L.L.C., Tubbs, and Clyde's collective acts and omissions were not only intentionally willful, wanton, reckless, and malicious – in that they are the product of conduct and deliberate policy choices made despite substantial risks of serious harm, of which Defendants were aware – but they also evince a complete and deliberate indifference to and/or a conscious and reckless disregard of the rights of Fillmore and all prisoners in the custody of the PCSO.  Therefore, Plaintiffs are entitled to an award of punitive or exemplary damages in an amount sufficient to: a) punish said Defendants and deter others from engaging in like conduct in the future; and b) engender meaningful health care reform at the DCJ.

131.    Plaintiffs are entitled to recover their reasonable attorney fees, costs, and expenses from Defendants Duchesne County, Boren, Tubbs, L.L.C., Tubbs, and Clyde as provided by 42 U.S.C. § 1988.

**COUNT I – 42 U.S.C. § 1983**
**EIGHTH AND FOURTEENTH AMENDMENTS**
**DELIBERATE INDIFFERENCE**
**TO SERIOUS MEDICAL/MENTAL HEALTH NEED**
**AND FAILURE TO PROVIDE**
**MEDICAL/MENTAL HEALTH CARE AND TREATMENT**
**(AGAINST DEFENDANTS DUCHESNE COUNTY AND BOREN**
**IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES)**

132.    Plaintiffs hereby adopt, re-allege, and incorporate by reference the allegations outlined in Paragraphs 1-132, above.

133.    At all relevant times contemplated herein, and while acting under color of state law, Boren has served as the duly elected Sheriff of Duchesne County and exercised the statutory mandate outlined in UCA §17-22-2.

134.    As the duly elected Sheriff of Duchesne County, Boren not only directly and materially participates in county budgetary processes that have a direct impact on staffing plans, jail conditions, and contract services for the DCSO/DCJ, but he is also vested with, directly responsible for, and personally exercises final decision-making authority over all aspects of DCSO/DCJ operations.  His mandatory functions include, *inter alia*, making determinations that concern: a) the "Duchesne County Sheriff's Office Manual;" b) DCSO/DCJ procedures, guidelines, and organizational policies; c) DCSO/DCJ organization and supervisory schemes; d) departmental staffing plans/duty assignments; e) position job descriptions; f) training regimens for DCSO/DCJ personnel; g) DCJ medical/mental health services that cannot be provided on-site; and h) prisoner grievances.

135.    As Sheriff, Boren serves as the "chief executive officer" of law enforcement for Duchesne County, vested with the statutory mandate outlined in UCA §17-22-2, who, according to the Sheriff Position Description, "[s]ets and implements standard operating procedures for law enforcement services for the County[,]" including those at the DCJ.

136.    By virtue of his office, Boren is also vested with final decision-making authority over all DCSO/DCJ procedures, guidelines, organizational policies, and orders. As such, Boren is required to develop, periodically review, and ensure compliance with

the departmental/institutional directives outlined in the "Duchesne County Sheriff's Office Manual" – which are cooperatively promulgated with and reviewed by the Duchesne County Counselor/Attorney, with input from senior command staff – and sign/approve them before they are given effect.

137.    Through his action/inaction on matters, processes, and concerns that impact the overall operations of the DCSO and the DCJ, Boren is similarly empowered to tacitly approve or otherwise give official effect to practices and customs.

138.    The practices and customs observed by DCSO and Tubbs, L.L.C./Tubbs personnel assigned to the DCJ, including Clyde, were tacitly approved and/or recklessly set in motion by Defendants Duchesne County and Boren.  Said practices and customs – including those of delegating the majority of health care services to a single LPN, constructively discouraging prisoners from seeking mental health care, and forcing prisoners with psychotropic medications to go cold-turkey – not only occasioned and/or materially contributed to the systemic deficiencies outlined in Paragraph 127, above, but they were so continuing, persistent, and widespread so as to constitute official policies, procedures, and actions/inactions.

139.    Collectively, DCSO/DCJ and Tubbs, L.L.C./Tubbs' policies, procedures, practices, and customs observed by commissioned, lay, and contract personnel assigned to the DCJ not only posed substantial risks of serious harm to Fillmore's health and safety that rose to the level of deliberate indifference, but they also operated to deprive Fillmore of her right to be free from cruel and unusual punishment by: a) denying her access to qualified mental health personnel capable of assessing and treating her psychiatric

disorders; and b) subjecting her to a progressively irrational and manic state of mind over a period of eight (8) days, which culminated in self-harm, by withholding her psychotropic medications in contravention of prevailing clinical practices.

140.    Said policies, procedures, practices, customs and official actions/inactions outlined in Paragraphs 1-132, above, subjected Fillmore to the unnecessary and wanton infliction of pain in contravention of the Eighth Amendment.  They also demonstrate a deliberate indifference to her serious medical, mental health, and psychiatric needs by occasioning, materially contributing to, and/or otherwise tacitly facilitating/authorizing the systemic deficiencies outlined in Paragraph 127, above.

141.    The nineteen (19) systemic deficiencies outlined in Paragraph 127, above, are the product of official policies, procedures, practices, customs, and actions that were promulgated or tacitly authorized by Duchesne County, DCSO/DCJ, and Tubbs, L.L.C./Tubbs personnel who were vested with final decision-making authority in like matters – and all nineteen (19) caused or materially contributed to: a) the systemic and deliberate indifference to Fillmore's constitutional right to be free from cruel and unusual punishment; and the unnecessary and wanton infliction of pain she experienced.

142.    Having been named in myriad grievances and lawsuits involving the provision of mental health care at the DCJ, and by virtue of the same, Duchesne County, the DCSO, the DCJ, Boren, Tubbs, Tubbs, L.L.C., and Clyde also had actual and/or constructive knowledge of the specific barriers to mental health/psychiatric care at the DCJ and the overall lack of access to qualified mental health personnel.

143.    Duchesne County, Boren, Tubbs, L.L.C., and Tubbs' official policies, procedures, practices, customs, and actions/inactions, which comprise the moving force behind Fillmore's injuries operated to deprive Fillmore of the right to adequate and clinically appropriate assessment and treatment of her serious mental health/psychiatric conditions, and, but for the same, she would not have been deprived of rights secured by the Eighth and Fourteenth Amendments to the United States Constitution.

144.    As a direct and proximate result of Duchesne County, Boren, Tubbs, L.L.C., Tubbs, and Clyde's violation of her civil rights, and said Defendants' collective acts and omissions, Fillmore suffered the following injuries:

a.    She experienced tremendous physical pain, mental anguish, and physical suffering;

b.    She suffered the loss of enjoyment of her life;

c.    She lost the chance to be released and to reenter society;

d.    She lost the opportunity to be successfully treated;

e.    She lost her life;

f.    She lost the opportunity to get married and have a family;

g.    She lost future income and savings; and

h.    She lost the consortium of her loving family.

145.    As a direct and proximate result of Duchesne County, Boren, Tubbs, L.L.C., Tubbs, and Clyde's violation of Fillmore's civil rights, and said Defendants' collective acts and omissions, Zoumadakis suffered the following injuries:

       a.     She experienced tremendous mental anguish, suffering, and bereavement;

       b.     She lost Fillmore's comfort, companionship, and consortium; and

       c.     She lost the opportunity to see Fillmore live and thrive.

146.    In his individual capacity, Boren's collective acts and omissions were not only intentionally willful, wanton, reckless, and malicious – in that they are the product of conduct and deliberate policy choices made despite substantial risks of serious harm, of which he was aware – but they also evince a complete and deliberate indifference to and/or a conscious and reckless disregard of the rights of Fillmore and all prisoners in the custody of the PCSO.  Therefore, Plaintiffs are entitled to an award of punitive or exemplary damages from Boren in an amount sufficient to: a) punish Boren and deter others from engaging in like conduct in the future; and b) engender meaningful health care reform at the DCJ.

147.    Plaintiffs are entitled to recover their reasonable attorney fees, costs, and expenses from Duchesne County and Boren as provided by 42 U.S.C. § 1988.

**COUNT II – 42 U.S.C. § 1983**

**EIGHTH AND FOURTEENTH AMENDMENTS**

**FAILURE TO TRAIN / INADEQUATE TRAINING**

**(AGAINST DEFENDANTS DUCHESNE COUNTY AND BOREN**

**IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES)**

148.    Plaintiffs hereby adopt, re-allege, and incorporate by reference the allegations outlined in Paragraphs 1-148, above.

149.     At all relevant times contemplated herein, and while acting under color of state law, Boren served as the duly elected Sheriff of Duchesne County and exercised the statutory mandate outlined in UCA §17-22-2.

150.     As the duly elected Sheriff of Duchesne County, Boren not only directly and materially participates in county budgetary processes that have a direct impact on staffing plans, jail conditions, and contract services for the DCSO/DCJ, but he is also vested with, directly responsible for, and personally exercises final decision-making authority over all aspects of DCSO/DCJ operations.  His mandatory functions include, *inter alia*, making determinations that concern: a) the "Duchesne County Sheriff's Office Manual;" b) DCSO/DCJ procedures, guidelines, and organizational policies; c) DCSO/DCJ organization and supervisory schemes; d) departmental staffing plans/duty assignments; e) position job descriptions; f) training regimens for DCSO/DCJ personnel; g) DCJ medical/mental health services that cannot be provided on-site; and h) prisoner grievances.

151.     As Sheriff, Boren serves as the "chief executive officer" of law enforcement for Duchesne County, vested with the statutory mandate outlined in UCA §17-22-2, who, according to the Sheriff Position Description, "[s]ets and implements standard operating procedures for law enforcement services for the County[,]" including those at the DCJ.

152.     By virtue of his office, Boren is also vested with final decision-making authority over all DCSO/DCJ procedures, guidelines, organizational policies, and orders. As such, Boren is required to develop, periodically review, and ensure compliance with

the departmental/institutional directives outlined in the "Duchesne County Sheriff's Office Manual" – which are cooperatively promulgated with the Duchesne County Counselor/Attorney, with input from senior command staff – and sign/approve them before they are given effect.

153.    Through his action/inaction on matters, processes, and concerns that impact the overall operations of the DCSO and the DCJ, Boren is similarly empowered to tacitly approve or otherwise give official effect to practices and customs.

154.    By virtue of, *inter alia*, UCA §17-22-2, DCSO/DCJ policies/procedures, and the Sheriff Position Description, Boren was not only vested with the duty to provide reasonable and adequate training for commissioned and lay DCSO personnel assigned to the DCJ, including Clyde, but he also had a duty to promulgate training requirements and implement training regimens for said personnel.

155.    Duchesne County and Boren failed to provide reasonable and adequate training for DCSO/DCJ personnel – including specific training to ensure that DCSO/DCJ personnel complied with DCSO/DCJ policies, conducted intake health screens properly, documented clinical conditions/medications reported by incoming prisoners accurately, designated clinically appropriate medical dispositions, made timely medical/mental health referrals, responded to medical emergencies appropriately, and generally safeguarded the rights of prisoners.

156.    Said failure, which was tacitly authorized by Boren, and ratified by the DCSO command staff, was so persistent and widespread that it constituted official policy and action.

157.    Said failure not only resulted in the systemic deficiencies outlined in Paragraph 127, above, but it also recklessly posed substantial risks of serious harm to the health and safety of all inmates confined to the DCJ, including Fillmore, because it operated to deprive them of their Eighth Amendment right to be free from cruel and unusual punishment and the unnecessary and wanton infliction of pain.

158.    Said failure comprised the moving force behind the violation of Fillmore's constitutional rights.  But for the same, Fillmore's constitutional rights would not have been violated and she would not have been injured.

159.    Having been named in myriad grievances and lawsuits involving the provision of mental health care at the DCJ, and by virtue of the same, Duchesne County, the DCSO, the DCJ, Boren, Tubbs, Tubbs, L.L.C., and Clyde also had actual and/or constructive knowledge of the specific barriers to mental health/psychiatric care at the DCJ and the overall lack of access to qualified mental health personnel.

160.    As set forth herein, Duchesne County and Boren's collective actions and omissions not only demonstrate deliberate indifference to the serious medical/mental health/psychiatric needs of Fillmore and the DCJ prisoner population as a whole, but they also evince a conscious and reckless disregard of substantive rights protected by the Eighth and Fourteenth Amendments of the United States Constitution, the United States Code, and the laws of the State of Utah.

161.    As a direct and proximate result of Duchesne County and Boren's actions and omissions, Plaintiffs, Fillmore and Zoumadakis, have been injured and damaged as specifically set forth in Paragraphs 145 and 146, above.

162.   In his individual capacity, Boren's collective acts and omissions were not only intentionally willful, wanton, reckless, and malicious – in that they are the product of conduct and deliberate policy choices made despite substantial risks of serious harm, of which he was aware – but they also evince a complete and deliberate indifference to and/or a conscious and reckless disregard of the rights of Fillmore and all prisoners in the custody of the PCSO.   Therefore, Plaintiffs are entitled to an award of punitive or exemplary damages from Boren in an amount sufficient to: a) punish Boren and deter others from engaging in like conduct in the future; and b) engender meaningful health care reform at the DCJ.

163.   Plaintiffs are entitled to recover their reasonable attorney fees, costs, and expenses from Duchesne County and Boren as provided by 42 U.S.C. § 1988.

## COUNT III – 42 U.S.C. § 1983
## EIGHTH AND FOURTEENTH AMENDMENTS
## FAILURE TO SUPERVISE, DIRECT AND CONTROL / INADEQUATE SUPERVISION, DIRECTION, AND CONTROL
## (AGAINST DEFENDANTS DUCHESNE COUNTY AND BOREN IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES)

164.   Plaintiffs hereby adopt, re-allege, and incorporate by reference the allegations outlined in Paragraphs 1-164, above.

165.   At all relevant times contemplated herein, and while acting under color of state law, Boren served as the duly elected Sheriff of Duchesne County and exercised the statutory mandate outlined in UCA §17-22-2.

166.    As the duly elected Sheriff of Duchesne County, Boren not only directly and materially participates in county budgetary processes that have a direct impact on staffing plans, jail conditions, and contract services for the DCSO/DCJ, but he is also vested with, directly responsible for, and personally exercises final decision-making authority over all aspects of DCSO/DCJ operations.  His mandatory functions include, *inter alia*, making determinations that concern: a) the "Duchesne County Sheriff's Office Manual;" b) DCSO/DCJ procedures, guidelines, and organizational policies; c) DCSO/DCJ organization and supervisory schemes; d) departmental staffing plans/duty assignments; e) position job descriptions; f) training regimens for DCSO/DCJ personnel; g) DCJ medical/mental health services that cannot be provided on-site; and h) prisoner grievances.

167.    As Sheriff, Boren serves as the "chief executive officer" of law enforcement for Duchesne County, vested with the statutory mandate outlined in UCA §17-22-2, who, according to the Sheriff Position Description, "[s]ets and implements standard operating procedures for law enforcement services for the County[,]" including those at the DCJ.

168.    By virtue of his office, Boren is also vested with final decision-making authority over all DCSO/DCJ procedures, guidelines, organizational policies, and orders. As such, Boren is required to develop, periodically review, and ensure compliance with the departmental/institutional directives outlined in the "Duchesne County Sheriff's Office Manual" – which are cooperatively promulgated with the Duchesne County

Counselor/Attorney, with input from senior command staff – and sign/approve them before they are given effect.

169.    Through his action/inaction on matters, processes, and concerns that impact the overall operations of the DCSO and the DCJ, Boren is similarly empowered to tacitly approve or otherwise give official effect to practices and customs.

170.    By virtue of, *inter alia*, UCA §17-22-2, DCSO/DCJ policies/procedures, and the Sheriff Position Description, Boren was not only vested with the duty to supervise, direct, and control commissioned, lay, and contract personnel assigned to the DCJ – including Tubbs, L.L.C., Tubbs, Tubbs, L.L.C./Tubbs personnel, and Clyde – but he also had a duty to develop, implement, and/or otherwise conduct: contract monitoring regimens; performance audits; quality improvement activities, and supervisory schemes.

171.    Duchesne County and Boren failed to supervise, direct, and control DCSO/DCJ personnel and Tubbs, L.L.C./Tubbs personnel to ensure that they observed DCSO/DCJ policies, complied with the DCJ/Tubbs Contract, conducted intake health screens properly, documented clinical conditions/medications reported by incoming prisoners accurately, designated clinically appropriate medical dispositions, made timely medical/mental health referrals, responded to medical emergencies appropriately, and generally safeguarded the rights of prisoners.

172.    Said failure, which was tacitly authorized by Boren, and ratified by the DCSO command staff, was so persistent and widespread that it constituted official policy and action.

173.    Said failure not only resulted in the systemic deficiencies outlined in Paragraph 128, above, but it also recklessly posed substantial risks of serious harm to the health and safety of all inmates confined to the DCJ, including Fillmore, because it operated to deprive them of their Eighth Amendment right to be free from cruel and unusual punishment and the unnecessary and wanton infliction of pain.

174.    Said failure comprised the moving force behind the violation of Fillmore's constitutional rights.  But for the same, Fillmore's constitutional rights would not have been violated and she would not have been injured.

175.    Having been named in myriad grievances and lawsuits involving the provision of mental health care at the DCJ, and by virtue of the same, Duchesne County, the DCSO, the DCJ, Boren, Tubbs, Tubbs, L.L.C., and Clyde also had actual and/or constructive knowledge of the specific barriers to mental health/psychiatric care at the DCJ and the overall lack of access to qualified mental health personnel.

176.    As set forth herein, Duchesne County and Boren's collective actions and omissions not only demonstrate deliberate indifference to the serious medical/mental health/psychiatric needs of Fillmore and the DCJ prisoner population as a whole, but they also evince a conscious and reckless disregard of substantive rights protected by the Eighth and Fourteenth Amendments of the United States Constitution, the United States Code, and the laws of the State of Utah.

177.    As a direct and proximate result of Duchesne County and Boren's actions and omissions, Plaintiffs, Fillmore and Zoumadakis, have been injured and damaged as specifically set forth in Paragraphs 145 and 146, above.

178.    In his individual capacity, Boren's collective acts and omissions were not only intentionally willful, wanton, reckless, and malicious – in that they are the product of conduct and deliberate policy choices made despite substantial risks of serious harm, of which he was aware – but they also evince a complete and deliberate indifference to and/or a conscious and reckless disregard of the rights of Fillmore and all prisoners in the custody of the PCSO.   Therefore, Plaintiffs are entitled to an award of punitive or exemplary damages from Boren in an amount sufficient to: a) punish Boren and deter others from engaging in like conduct in the future; and b) engender meaningful health care reform at the DCJ.

179.    Plaintiffs are entitled to recover their reasonable attorney fees, costs, and expenses from Duchesne County and Boren as provided by 42 U.S.C. § 1988.

## COUNT IV – 42 U.S.C. § 12132
## TITLE II OF THE AMERICANS WITH DISABILITIES ACT ("ADA")
## VIOLATIONS OF THE ADA
## (AGAINST DEFENDANTS DUCHESNE COUNTY AND BOREN
## IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES)

180.    Plaintiffs hereby adopt, re-allege, and incorporate by reference the allegations outlined in Paragraphs 1-180, above.

181.    At all relevant times contemplated herein, and while acting under color of state law, Boren has served as the duly elected Sheriff of Duchesne County and exercised the statutory mandate outlined in UCA §17-22-2.

182.    As the duly elected Sheriff of Duchesne County, Boren not only directly and materially participates in county budgetary processes that have a direct impact on

staffing plans, jail conditions, and contract services for the DCSO/DCJ, but he is also vested with, directly responsible for, and personally exercises final decision-making authority over all aspects of DCSO/DCJ operations. His mandatory functions include, *inter alia*, making determinations that concern: a) the "Duchesne County Sheriff's Office Manual;" b) DCSO/DCJ procedures, guidelines, and organizational policies; c) DCSO/DCJ organization and supervisory schemes; d) departmental staffing plans/duty assignments; e) position job descriptions; f) training regimens for DCSO/DCJ personnel; g) DCJ medical/mental health services that cannot be provided on-site; and h) prisoner grievances.

183.    As Sheriff, Boren serves as the "chief executive officer" of law enforcement for Duchesne County, vested with the statutory mandate outlined in UCA §17-22-2, who, according to the Sheriff Position Description, "[s]ets and implements standard operating procedures for law enforcement services for the County[,]" including those at the DCJ.

184.    By virtue of his office, Boren is also vested with final decision-making authority over all DCSO/DCJ procedures, guidelines, organizational policies, and orders. As such, Boren is required to develop, periodically review, and ensure compliance with the departmental/institutional directives outlined in the "Duchesne County Sheriff's Office Manual" – which are cooperatively promulgated with the Duchesne County Counselor/Attorney, with input from senior command staff – and sign/approve them before they are given effect.

185.   Through his action/inaction on matters, processes, and concerns that impact the overall operations of the DCSO and the DCJ, Boren is similarly empowered to tacitly approve or otherwise give official effect to practices and customs.

186.   The practices and customs observed by DCSO and Tubbs, L.L.C./Tubbs personnel assigned to the DCJ, including Clyde, were tacitly approved and/or recklessly set in motion by Defendants Duchesne County and Boren.  Said practices and customs not only occasioned and/or materially contributed to the systemic deficiencies outlined in Paragraph 127, above, but they were so continuing, persistent, and widespread so as to constitute official policies, procedures, and actions/inactions.

187.   Said practices and customs operated to exclude prisoners afflicted with serious mental health/psychiatric conditions from clinical interventions generally available to non-afflicted prisoners by, *inter alia*:

    a.   Discouraging prisoners with mental/psychiatric conditions from seeking mental health care by implementing barriers to access such care;

    b.   Discontinuing treatment regimens ordered by treating qualified mental health professionals;

    c.   Treating mental health care as "elective care" subject to the clinical fiat and preauthorization of Duchesne County, Boren, and the DCSO;

    d.   Delegating primary mental health care to an LPN with minimal mental health training and experience;

    e.   Withholding psychotropic medications from prisoners and forcing them to go cold-turkey; and

f.      Omitting a category for mental/behavioral health from DCJ "Medical Request" forms.

188.    By operation of the Utah Code, the DCJ is owned and administered by Duchesne County and Boren.

189.    Duchesne County, by and through the DCSO, the DCJ, and Boren, contract with Tubbs to serve as the Medical Director at the DCJ.

190.    As the DCJ Medical Director, vested with the "responsibility and authority to administer the Health care of prisoners," Tubbs, by and through his corporate alter-ego, Tubbs, L.L.C., personally developed, expressly approved, and/or otherwise tacitly authorized: a) the DCJ Clinical Pathways utilized by Tubbs, L.L.C. medical personnel; and b) the DCJ Nursing Protocols utilized by the Corrections LPN.

191.    Said DCJ Clinical Pathways and DCJ Nursing Protocols were not adequate to provide for the routine and emergency medical/mental health needs of prisoners in that, *inter alia*, they did not provide sufficient guidance in the assessment/treatment of serious mental health/psychiatric conditions.

192.    The DCJ is partially funded by federal funds paid to Duchesne County by the federal government and the BIA pursuant to a contract with Duchesne County for housing Native American prisoners at the DCJ.  As such, the DCJ constitutes a public entity within the meaning of the ADA.

193.    At the time of her death, Fillmore suffered from, had been diagnosed with, and was undergoing treatment for myriad serious mental health/psychiatric conditions, including: Anxiety/Panic Disorder, PTSD, Major Depressive Disorder, and ADHD –

disabilities which, to varying degrees, impaired her ability to hold a job and to function normally.

194.    On account of the severity of her mental health/psychiatric conditions, Fillmore had also been qualified for and was receiving Social Security Disability Insurance ("SSDI") benefits at the time of her death.  As such, Fillmore was a qualified individual with a disability.

195.    Not only were Fillmore's mental health/psychiatric conditions well documented within the DCSO/DCJ, but she reported them during her initial health screening on November 16, 2016 as well.

196.    As a matter of course, prisoners afflicted with mental health/psychiatric disorders, like Fillmore, were neither provided access to qualified mental health professionals capable of assessing and treating her mental/psychiatric disorders nor was she given her psychotropic medications.

197.    Having been named in myriad grievances and lawsuits involving the provision of mental health care at the DCJ, and by virtue of the same, Duchesne County, the DCSO, the DCJ, Boren, Tubbs, and Tubbs, L.L.C. all had actual and/or constructive knowledge that prisoners afflicted with mental health/psychiatric disorders were excluded from accessing the same panoply of clinical services afforded to prisoners who are not so afflicted.

198.    As a direct and proximate result of Duchesne County and Boren's actions and omissions, Plaintiffs, Fillmore and Zoumadakis, have been injured and damaged as specifically set forth in Paragraphs 145 and 146, above.

**COUNT V – 42 U.S.C. § 1983**

**EIGHTH AND FOURTEENTH AMENDMENTS**

**DELIBERATE INDIFFERENCE**

**TO SERIOUS MEDICAL/MENTAL HEALTH NEED**

**AND FAILURE TO PROVIDE**

**MEDICAL/MENTAL HEALTH CARE AND TREATMENT**

**(AGAINST DEFENDANTS TUBBS, L.L.C. AND TUBBS**

**IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES)**

199.     Plaintiffs hereby adopt, re-allege, and incorporate by reference the allegations outlined in Paragraphs 1-199, above.

200.     At all relevant times contemplated herein, and while acting under color of state law, Tubbs, L.L.C., Tubbs' corporate alter-ego, was contracted to serve as the designated health care provider for the DCJ and Tubbs himself was contracted to serve as the DCJ Medical Director.

201.     The DCJ/Tubbs Contract – which was negotiated by Boren, the Duchesne County Commission, and Tubbs – reflects levels of care, staffing, and clinical services that were specifically agreed upon to fit Duchesne County's budget and to comport with DCSO/DCJ policy objectives.  As such, the staffing plan, scope of health care services, and clinical duties outlined therein not only contemplate deliberate policy determinations, but they also comprise DCSO/DCJ health care policies/procedures adopted/enacted by those vested with final decision-making authority in like matters.

202.     As Medical Director of the DCJ, Tubbs – by and through his corporate alter-ego, Tubbs, L.L.C. – is vested with, directly responsible for, and personally exercises final decision-making authority over, *inter alia*: a) quality improvement activities; b)

training regimens for DCJ medical/nursing personnel; and c) supervisory schemes for DCJ medical/nursing personnel.

203.    By virtue of his clinical role, Tubbs is also vested with final decision-making authority over: a) the clinical pathways ("DCJ Clinical Pathways") utilized by Tubbs, L.L.C. medical personnel; and b) the nursing protocols and standing orders ("DCJ Nursing Protocols") utilized by the Corrections LPN – neither of which provided sufficient guidance on mental health/psychiatric referrals or allowed for the use of psychotropic medications to treat mental health/psychiatric conditions.

204.    Through his action/inaction on matters, processes, and concerns that impact the overall provision of clinical services, Tubbs, L.L.C./Tubbs are similarly empowered to tacitly approve or otherwise give official effect to practices and customs.

205.    The practices and customs observed by Tubbs, L.L.C./Tubbs personnel and Clyde were tacitly approved and/or recklessly set in motion by Tubbs, L.L.C./Tubbs.  Said practices and customs – including those of constructively discouraging prisoners from seeking mental health care and withholding psychotropic medications from afflicted prisoners – not only occasioned and/or materially contributed to the systemic deficiencies outlined in Paragraph 127, above, but they were so continuing, persistent, and widespread so as to constitute official policies, procedures, and actions/inactions.

206.    Collectively, DCSO/DCJ and Tubbs, L.L.C./Tubbs' policies, procedures, practices, and customs observed by lay and contract personnel assigned to the DCJ not only posed substantial risks of serious harm to Fillmore's health and safety that rose to the level of deliberate indifference, but they also operated to deprive Fillmore of her right to

be free from cruel and unusual punishment by: a) denying her access to qualified mental health personnel capable of assessing and treating her psychiatric disorders; and b) subjecting her to a progressively irrational and manic state of mind over a period of eight (8) days, which culminated in self-harm, by withholding her psychotropic medications in contravention of prevailing clinical practices.

207.   Said policies, procedures, practices, customs and official actions/inactions outlined in Paragraphs 1-132, above, subjected Fillmore to the unnecessary and wanton infliction of pain in contravention of the Eighth Amendment.  They also demonstrate a deliberate indifference to her serious medical, mental health, and psychiatric needs by occasioning, materially contributing to, and/or otherwise tacitly facilitating/authorizing the systemic deficiencies outlined in Paragraph 127, above.

208.   The nineteen (19) systemic deficiencies outlined in Paragraph 127, above, are the product of official policies, procedures, practices, customs, and actions that were collectively promulgated or tacitly authorized by Duchesne County, DCSO/DCJ, and Tubbs, L.L.C./Tubbs who were vested with final decision-making authority in like matters – and all nineteen (19) caused or materially contributed to: a) the systemic and deliberate indifference to Fillmore's constitutional right to be free from cruel and unusual punishment; and the unnecessary and wanton infliction of pain she experienced.

209.   Having been named in myriad grievances and lawsuits involving the provision of mental health care at the DCJ, and by virtue of the same, Tubbs, L.L.C. and Tubbs had actual and/or constructive knowledge of the specific barriers to mental

51

health/psychiatric care at the DCJ and the overall lack of access to qualified mental health personnel.

210.    By virtue of Tubbs' NCCHC membership, his NCCHC CCHP-P certification, and said grievances and lawsuits, Tubbs, L.L.C./Tubbs had actual and/or constructive knowledge of the high incidence of mental health disorders among jail/prison populations, including that of the DCJ, and the necessity of timely access to qualified mental health personnel.

211.    Tubbs, L.C.C./Tubbs' official policies, procedures, practices, customs, and actions/inactions, which comprise the moving force behind Fillmore's injuries, operated to deprive Fillmore of the right to adequate and clinically appropriate assessment and treatment of her serious mental health/psychiatric conditions, and, but for the same, she would not have been deprived of rights secured by the Eighth and Fourteenth Amendments to the United States Constitution.

212.    As a direct and proximate result of Tubbs, L.L.C./Tubbs' actions and omissions, Plaintiffs, Fillmore and Zoumadakis, have been injured and damaged as specifically set forth in Paragraphs 145 and 146, above.

213.    Tubbs, L.L.C. and Tubbs's collective acts and omissions were not only intentionally willful, wanton, reckless, and malicious – in that they are the product of conduct and deliberate policy choices made despite substantial risks of serious harm, of which Defendants were aware – but they also evince a complete and deliberate indifference to and/or a conscious and reckless disregard of the rights of Fillmore and all prisoners in the custody of the DCSO.  Therefore, Plaintiffs are entitled to an award of

punitive or exemplary damages from Tubbs, L.L.C. and Tubbs in an amount sufficient to: a) punish said Defendants and deter others from engaging in like conduct in the future; and b) engender meaningful health care reform at the DCJ.

214.     Plaintiffs are entitled to recover their reasonable attorney fees, costs, and expenses from Tubbs, L.L.C. and Tubbs as provided by 42 U.S.C. § 1988.

<strong>COUNT VI – 42 U.S.C. § 1983</strong><br><strong>EIGHTH AND FOURTEENTH AMENDMENTS</strong><br><strong>FAILURE TO TRAIN / INADEQUATE TRAINING</strong><br><strong>(AGAINST DEFENDANTS TUBBS, L.L.C. AND TUBBS</strong><br><strong>IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES)</strong>

215.     Plaintiffs hereby adopt, re-allege, and incorporate by reference the allegations outlined in Paragraphs 1-215, above.

216.     At all relevant times contemplated herein, and while acting under color of state law, Tubbs, L.L.C., Tubbs' corporate alter-ego, was contracted to serve as the designated health care provider for the DCJ and Tubbs himself was contracted to serve as the DCJ Medical Director.

217.     The DCJ/Tubbs Contract – which was negotiated by Boren, the Duchesne County Commission, and Tubbs – reflects levels of care, staffing, and clinical services that were specifically agreed upon to fit Duchesne County's budget and to comport with DCSO/DCJ policy objectives.  As such, the staffing plan, scope of health care services, and clinical duties outlined therein not only contemplate deliberate policy determinations, but they also comprise DCSO/DCJ health care policies/procedures adopted/enacted by those vested with final decision-making authority in like matters.

218.    As Medical Director of the DCJ, Tubbs – by and through his corporate alter-ego, Tubbs, L.L.C. – is vested with, directly responsible for, and personally exercises final decision-making authority over, *inter alia*: a) quality improvement activities; b) training regimens for DCJ medical/nursing personnel; and c) supervisory schemes for DCJ medical/nursing personnel.

219.    Through his action/inaction on matters, processes, and concerns that impact the overall provision of clinical services, Tubbs, L.L.C./Tubbs are similarly empowered to tacitly approve or otherwise give official effect to practices and customs.

220.    By virtue of his clinical role and the DCJ/Tubbs Contract, Tubbs was not only vested with the duty to provide reasonable and adequate training for Tubbs, L.L.C./Tubbs personnel and lay DCSO personnel assigned to the DCJ, including Clyde, but he also had a duty to promulgate training requirements and implement training regimens for said personnel.

221.    Tubbs, L.L.C. and Tubbs failed to provide reasonable and adequate training for DCJ medical/nursing personnel – including specific training to ensure that said personnel complied with DCSO/DCJ policies, triaged medical requests properly, documented clinical conditions/medications reported by incoming prisoners accurately, made timely medical/mental health referrals, responded to medical emergencies appropriately, and generally safeguarded the rights of prisoners.

222.    Said failure, which was tacitly authorized by Tubbs, and ratified by the DCSO/DCJ staff, was so persistent and widespread that it constituted official policy and action.

223.     Said failure not only resulted in the systemic deficiencies outlined in Paragraph 127, above, but it also recklessly posed substantial risks of serious harm to the health and safety of all inmates confined to the DCJ, including Fillmore, because it operated to deprive them of their Eighth Amendment right to be free from cruel and unusual punishment and the unnecessary and wanton infliction of pain.

224.     Said failure comprised the moving force behind the violation of Fillmore's constitutional rights.  But for the same, Fillmore's constitutional rights would not have been violated and she would not have been injured.

225.     Having been named in myriad grievances and lawsuits involving the provision of mental health care at the DCJ, and by virtue of the same, Tubbs and Tubbs, L.L.C. had actual and/or constructive knowledge of the specific barriers to mental health/psychiatric care at the DCJ and the overall lack of access to qualified mental health personnel.

226.     By virtue of Tubbs' NCCHC membership, his NCCHC CCHP-P certification, and said grievances and lawsuits, Tubbs, L.L.C./Tubbs had actual and/or constructive knowledge of the high incidence of mental health disorders among jail/prison populations, including that of the DCJ, and the necessity of timely access to qualified mental health personnel.

227.     As set forth herein, Duchesne County and Boren's collective actions and omissions not only demonstrate deliberate indifference to the serious medical/mental health/psychiatric needs of Fillmore and the DCJ prisoner population as a whole, but they also evince a conscious and reckless disregard of substantive rights protected by the

Eighth and Fourteenth Amendments of the United States Constitution, the United States Code, and the laws of the State of Utah.

228.    As a direct and proximate result of Tubbs, L.L.C.'s actions and omissions, Plaintiffs, Fillmore and Zoumadakis, have been injured and damaged as specifically set forth in Paragraphs 145 and 146, above.

229.    Tubbs, L.L.C. and Tubbs's collective acts and omissions were not only intentionally willful, wanton, reckless, and malicious – in that they are the product of conduct and deliberate policy choices made despite substantial risks of serious harm, of which Defendants were aware – but they also evince a complete and deliberate indifference to and/or a conscious and reckless disregard of the rights of Fillmore and all prisoners in the custody of the PCSO.  Therefore, Plaintiffs are entitled to an award of punitive or exemplary damages from Tubbs, L.L.C. and Tubbs in an amount sufficient to: a) punish said Defendants and deter others from engaging in like conduct in the future; and b) engender meaningful health care reform at the DCJ.

230.    Plaintiffs are entitled to recover their reasonable attorney fees, costs, and expenses from Tubbs, L.L.C. and Tubbs as provided by 42 U.S.C. § 1988.

**COUNT VII – 42 U.S.C. § 1983**

**EIGHTH AND FOURTEENTH AMENDMENTS**

**FAILURE TO SUPERVISE, DIRECT AND CONTROL / INADEQUATE**

**SUPERVISION, DIRECTION, AND CONTROL**

**(AGAINST DEFENDANTS TUBBS, L.L.C. AND TUBBS**

**IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES)**

231.    Plaintiffs hereby adopt, re-allege, and incorporate by reference the allegations outlined in Paragraphs 1-231, above.

232.    At all relevant times contemplated herein, and while acting under color of state law, Tubbs, L.L.C., Tubbs' corporate alter-ego, was contracted to serve as the designated health care provider for the DCJ and Tubbs himself was contracted to serve as the DCJ Medical Director.

233.    The DCJ/Tubbs Contract – which was negotiated by Boren, the Duchesne County Commission, and Tubbs – reflects levels of care, staffing, and clinical services that were specifically agreed upon to fit Duchesne County's budget and to comport with DCSO/DCJ policy objectives.  As such, the staffing plan, scope of health care services, and clinical duties outlined therein not only contemplate deliberate policy determinations, but they also comprise DCSO/DCJ health care policies/procedures adopted/enacted by those vested with final decision-making authority in like matters.

234.    As Medical Director of the DCJ, Tubbs – by and through his corporate alter-ego, Tubbs, L.L.C. – is vested with, directly responsible for, and personally exercises final decision-making authority over, *inter alia*: a) quality improvement activities; d) training regimens for DCJ medical/nursing personnel; and b) supervisory schemes for DCJ medical/nursing personnel.

235.    Through his action/inaction on matters, processes, and concerns that impact the overall provision of clinical services, Tubbs, L.L.C./Tubbs are similarly empowered to tacitly approve or otherwise give official effect to practices and customs.

236.   By virtue of his clinical role and the DCJ/Tubbs Contract, Tubbs was not only vested with the duty to supervise, direct, and control Tubbs, L.L.C./Tubbs personnel and lay DCSO personnel assigned to the DCJ, including Clyde, but he also had a duty to develop, implement, and/or otherwise conduct: performance audits; quality improvement activities, and supervisory schemes.

237.   Tubbs, L.L.C. and Tubbs failed to supervise, direct, and control DCJ medical/nursing personnel to ensure that said personnel complied with DCSO/DCJ policies, triaged medical requests properly, documented clinical conditions/medications reported by incoming prisoners accurately, made timely medical/mental health referrals, responded to medical emergencies appropriately, and generally safeguarded the rights of prisoners.

238.   Said failure, which was tacitly authorized by Tubbs, and ratified by the DCSO/DCJ staff, was so persistent and widespread that it constituted official policy and action.

239.   Said failure not only resulted in the systemic deficiencies outlined in Paragraph 127, above, but it also recklessly posed substantial risks of serious harm to the health and safety of all inmates confined to the DCJ, including Fillmore, because it operated to deprive them of their Eighth Amendment right to be free from cruel and unusual punishment and the unnecessary and wanton infliction of pain.

240.   Said failure comprised the moving force behind the violation of Fillmore's constitutional rights.  But for the same, Fillmore's constitutional rights would not have been violated and she would not have been injured.

241.    Having been named in myriad grievances and lawsuits involving the provision of mental health care at the DCJ, and by virtue of the same, Tubbs and Tubbs, L.L.C. had actual and/or constructive knowledge of the specific barriers to mental health/psychiatric care at the DCJ and the overall lack of access to qualified mental health personnel.

242.    By virtue of Tubbs' NCCHC membership, his NCCHC CCHP-P certification, and said grievances and lawsuits, Tubbs, L.L.C./Tubbs had actual and/or constructive knowledge of the high incidence of mental health disorders among jail/prison populations, including that of the DCJ, and the necessity of timely access to qualified mental health personnel.

243.    As set forth herein, Duchesne County and Boren's collective actions and omissions not only demonstrate deliberate indifference to the serious medical/mental health/psychiatric needs of Fillmore and the DCJ prisoner population as a whole, but they also evince a conscious and reckless disregard of substantive rights protected by the Eighth and Fourteenth Amendments of the United States Constitution, the United States Code, and the laws of the State of Utah.

244.    As a direct and proximate result of Tubbs, L.L.C.'s actions and omissions, Plaintiffs, Fillmore and Zoumadakis, have been injured and damaged as specifically set forth in Paragraphs 145 and 146, above.

245.    Tubbs, L.L.C. and Tubbs's collective acts and omissions were not only intentionally willful, wanton, reckless, and malicious – in that they are the product of conduct and deliberate policy choices made despite substantial risks of serious harm, of

which Defendants were aware – but they also evince a complete and deliberate indifference to and/or a conscious and reckless disregard of the rights of Fillmore and all prisoners in the custody of the PCSO.  Therefore, Plaintiffs are entitled to an award of punitive or exemplary damages from Tubbs, L.L.C. and Tubbs in an amount sufficient to: a) punish said Defendants and deter others from engaging in like conduct in the future; and b) engender meaningful health care reform at the DCJ.

246.    Plaintiffs are entitled to recover their reasonable attorney fees, costs, and expenses from Tubbs, L.L.C. and Tubbs as provided by 42 U.S.C. § 1988.

**COUNT VIII – 42 U.S.C. § 1983**

**EIGHTH AND FOURTEENTH AMENDMENTS**

**DELIBERATE INDIFFERENCE**

**TO SERIOUS MEDICAL/MENTAL HEALTH NEED**

**AND FAILURE TO PROVIDE**

**MEDICAL/MENTAL HEALTH CARE AND TREATMENT**

**(AGAINST DEFENDANT CLYDE IN HER INDIVIDUAL CAPACITY)**

247.    Plaintiffs hereby adopt, re-allege, and incorporate by reference the allegations outlined in Paragraphs 1-247, above.

248.    At all relevant times contemplated herein, and while acting under color of state law, Clyde was employed by the DCSO and assigned to the DCJ, where she served as the Corrections LPN.

249.    As set forth herein, Clyde's duties include, *inter alia*: a) complying with "medical department rules" and the policies/procedures of the DCSO; b) "[a]ssessing, planning, and delivering nursing care[;]" c) "[c]oordinating multiple medical services for

diagnosis and treatment as directed by the physician[;]" and d) "[m]aintaining [a] working knowledge" of both "pharmacology" and "social and behavioral sciences[.]"

250.   Clyde not only possessed a rudimentary "working knowledge" of both "pharmacology" and "social and behavioral sciences," but she was able to recognize medical/mental health conditions and prescription medications reported by prisoners that required further clinical assessment by and direction from an advanced practitioner.  From a clinical perspective, Clyde knew what medical/mental health conditions were deemed serious.

251.   Despite the education and training Clyde completed to become an LPN – training which emphasized the importance of clinical history and continuity of care – she did not, nor was she required to, obtain, review, or otherwise utilize off-site medical/mental health records to confirm diagnoses and/or verify active prescriptions reported by prisoners.  As a result, and as a matter of course, Clyde routinely disregarded or ignored the clinical data collected by Booking Clerks.

252.   Clyde's refusal to utilize said clinical records and data evidenced a reckless disregard of a substantial risk of serious harm to prisoner health and safety – a risk which, by virtue of her education and licensure, she was aware.

253.   During the forty (40) hours per week that Clyde was on duty, she functioned as a gatekeeper to Tubbs, L.L.C./Tubbs personnel by: a) evaluating/assessing medical/mental health conditions reported by prisoners or otherwise identified by lay custody staff during the intake health screening; and b) triaging medical requests

61

submitted by prisoners for sick call.  It was a role that she periodically delayed and/or refused to fill by not facilitating access to qualified clinical personnel.

254.    Upon information and belief, Fillmore submitted a "Medical Request" to get her prescriptions filled and, ultimately, had a nurse encounter with Clyde in the immediate days before her death.

255.    Clyde, who also knew Fillmore from her previous incarcerations, reviewed Fillmore's current intake health screening prior to the encounter and was aware of Fillmore's psychiatric disorders and drug therapies.

256.    Despite her actual knowledge of the same, Clyde refused to give Fillmore any medication or to otherwise fulfill her gatekeeper role by contacting Tubbs, L.L.C./Tubbs personnel.  Instead, Clyde sent Fillmore back to her cell.  Before she did so, however, Clyde pointedly told her that she would not be getting her psychotropic medications because she was a "drug addict."

257.    Clyde's refusal to fulfill her gatekeeper role operated to deprive Fillmore of the right to adequate and clinically appropriate assessment and treatment of her serious mental health/psychiatric conditions, and, but for the same, she would not have been deprived of rights secured by the Eighth and Fourteenth Amendments to the United States Constitution.

258.    As a direct and proximate result of Tubbs, L.L.C./Tubbs' actions and omissions, Plaintiffs, Fillmore and Zoumadakis, have been injured and damaged as specifically set forth in Paragraphs 145 and 146, above.

259.    Clyde's refusal to fulfill her gatekeeper role was not only intentionally willful, wanton, reckless, and malicious, but it also evinces a complete and deliberate indifference to and/or a conscious and reckless disregard of Fillmore's constitutional rights.  Therefore, Plaintiffs are entitled to an award of punitive or exemplary damages from Clyde in an amount sufficient to: a) punish said Defendant and deter others from engaging in like conduct in the future; and b) engender meaningful health care reform at the DCJ.

260.    Plaintiffs are entitled to recover their reasonable attorney fees, costs, and expenses from Clyde as provided by 42 U.S.C. § 1988.

**COUNT IX – STATE LAW CLAIM**
**WRONGFUL DEATH**
**(AGAINST DEFENDANTS DUCHESNE COUNTY AND BOREN**
**IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES)**

261.    Plaintiffs hereby adopt, re-allege, and incorporate by reference the allegations outlined in Paragraphs 1-261, above.

262.    Duchesne County and Boren had a duty to ensure that Fillmore was provided with a level of medical care sufficient to meet her routine and emergency needs and that she had timely access to qualified medical/mental health personnel for evaluation and treatment.

263.    Duchesne County and Boren breached said duties by failing to, *inter alia*, exercise reasonable and ordinary care, skill, and diligence in devising an adequate health care delivery system, arranging for adequate contracts with health care providers, and implementing adequate DCSO/DCJ policies/procedures.

264.     But for Duchesne County and Boren's deviation from generally accepted and recognized correctional practices, Fillmore would not have died.

265.     As a direct and proximate result of Duchesne County and Boren's negligence, Plaintiffs, Fillmore and Zoumadakis, have been injured and damaged as specifically set forth in Paragraphs 145 and 146, above.

266.     Duchesne County and Boren are jointly and severally liable for Plaintiffs' injuries and damages.

**COUNT X – STATE LAW CLAIM**

**NEGLIGENCE**

**(AGAINST DEFENDANT DUCHESNE COUNTY AND BOREN IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES)**

267.     Plaintiffs hereby adopt, re-allege, and incorporate by reference the allegations outlined in Paragraphs 1-267, above.

268.     Duchesne County and Boren had a duty to ensure that: a) Fillmore was provided with a level of medical care sufficient to meet her routine and emergency needs; b) she was afforded access to qualified medical/mental health personnel for evaluation and treatment; and c) she received the treatment she required.

269.     Duchesne County and Boren breached said duties by failing to, *inter alia*, exercise reasonable and ordinary care, skill, and diligence in devising an adequate health care delivery system, promulgating and implementing adequate medical/mental health policies and procedures, training and supervising DCJ medical/nursing personnel, and actually providing the medical/mental health care and treatment Fillmore required.

270.    But for Duchesne County and Boren's deviation from generally accepted and recognized correctional medical/mental health practices, Fillmore would not have died.

271.    As a direct and proximate result of Duchesne County and Boren's negligence, Plaintiffs, Fillmore and Zoumadakis, were injured and damaged as specifically set forth in Paragraphs 145 and 146, above.

272.    Duchesne County and Boren are jointly and severally liable for Plaintiffs' injuries and damages.

## COUNT XI – STATE LAW CLAIM
## BREACH OF DUTY TO THIRD PARTY BENEFICIARY
## (AGAINST DEFENDANTS DUCHESNE COUNTY AND BOREN IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES)

273.    Plaintiffs hereby adopt, re-allege, and incorporate by reference the allegations outlined in Paragraphs 1-273, above.

274.    At all relevant times contemplated herein, Tubbs, L.L.C. and Tubbs were under contract with DCJ – and, by operation and extension, with Duchesne County and the DCSO – to provide health care services at the DCJ.

275.    Said contract was intended to benefit, safeguard, and protect the DCJ prisoner population as a whole, including Fillmore.

276.    Fillmore was a third party beneficiary to said contract, whose rights under the same vested when she was booked into the DCJ on or about November 16, 2016 and reported medical/mental health conditions requiring evaluation and treatment.

277.     Duchesne County and Boren did not monitor said contract, conduct routine performance audits, or otherwise ensure that Tubbs, L.L.C. and Tubbs complied with the express terms of the same.

278.     Tubbs, L.L.C./Tubbs breached the contract with the DCJ, the DCSO, and Duchesne County.

279.     Fillmore's medical/mental health conditions were neither evaluated nor treated by qualified clinical personnel and her psychotropic medications were withheld.

280.     As a direct and proximate result of said breach, Plaintiffs, Fillmore and Zoumadakis, were injured and damaged as specifically set forth in Paragraphs 145 and 146, above.

281.     Duchesne County and Boren are jointly and severally liable for Plaintiffs' injuries and damages.

**COUNT XII – STATE LAW CLAIM**
**WRONGFUL DEATH**
**(AGAINST DEFENDANTS TUBBS, L.L.C. AND TUBBS**
**IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES)**

282.     Plaintiffs hereby adopt, re-allege, and incorporate by reference the allegations outlined in Paragraphs 1-282, above.

283.     Tubbs, L.L.C. and Tubbs had a duty to ensure that Fillmore was provided with a level of medical care sufficient to meet her routine and emergency needs and that she had timely access to qualified medical/mental health personnel for evaluation and treatment.

284.    Tubbs, L.L.C. and Tubbs breached said duties by failing to, *inter alia*, exercise reasonable and ordinary care, skill, and diligence in devising an adequate health care delivery system, arranging for adequate contracts with health care providers, and implementing adequate DCSO/DCJ policies/procedures.

285.    But for Tubbs, L.L.C. and Tubbs' deviation from generally accepted and recognized correctional practices, Fillmore would not have died.

286.    As a direct and proximate result of Tubbs, L.L.C. and Tubbs' negligence, Plaintiffs, Fillmore and Zoumadakis, have been injured and damaged as specifically set forth in Paragraphs 145 and 146, above.

287.    Tubbs, L.L.C. and Tubbs are jointly and severally liable for Plaintiffs' injuries and damages.

**COUNT XIII – STATE LAW CLAIM**

**NEGLIGENCE**

**(AGAINST DEFENDANTS TUBBS, L.L.C. AND TUBBS**

**IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES)**

288.    Plaintiffs hereby adopt, re-allege, and incorporate by reference the allegations outlined in Paragraphs 1-288, above.

289.    Tubbs, L.L.C. and Tubbs had a duty to ensure that: a) Fillmore was provided with a level of health care sufficient to meet her routine and emergency needs; b) she was afforded access to qualified medical/mental health personnel for evaluation and treatment; and c) she received the treatment he required.

290.    Tubbs, L.L.C. and Tubbs breached said duties by failing to, *inter alia*, exercise reasonable and ordinary care, skill, and diligence in devising an adequate health

care delivery system, promulgating and implementing adequate medical/mental health policies and procedures, training and supervising DCJ medical/nursing personnel, and actually providing the medical/mental health care and treatment Fillmore required.

291.    But for Tubbs, L.L.C. and Tubbs' deviation from generally accepted and recognized correctional medical/mental health practices, Fillmore would not have died.

292.    As a direct and proximate result of Tubbs, L.L.C. and Tubbs' negligence, Plaintiffs, Fillmore and Zoumadakis, were injured and damaged as specifically set forth in Paragraphs 145 and 146, above.

293.    Tubbs, L.L.C. and Tubbs are jointly and severally liable for Plaintiffs' injuries and damages.

## COUNT XIV – STATE LAW CLAIM
## NEGLIGENCE
## (AGAINST DEFENDANT CLYDE IN HER INDIVIDUAL CAPACITY)

294.    Plaintiffs hereby adopt, re-allege, and incorporate by reference the allegations outlined in Paragraphs 1-296, above.

295.    As an LPN, Clyde had a general duty to: a) triage the medical/mental health conditions Fillmore reported during her intake health screening; b) afford Fillmore access to appropriate qualified medical/mental health personnel for evaluation and treatment; and c) ensure she received the treatment ordered by advanced practitioners.

296.    Clyde breached said duties by failing to, *inter alia*, exercise reasonable and ordinary care, skill, and diligence in providing adequate nursing care, performing clinical tasks consistent with her nursing license and scope of practice, and actually providing the medical/mental health care and treatment Fillmore required.

68

297.     Clyde specifically breached said duties by withholding the psychotropic medications prescribed by Fillmore's treating physician and forcing her to go cold-turkey because Clyde believed Fillmore was a "drug addict."

298.     But for Clyde's deviation from generally accepted and recognized nursing practices, Fillmore would not have died.

299.     As a direct and proximate result of Clyde's negligence, Plaintiffs, Fillmore and Zoumadakis, were injured and damaged as specifically set forth in Paragraphs 145 and 146, above.

Duchesne County and Boren are jointly and severally liable for Plaintiffs' injuries and damages.

## COUNT XV – CLASS CLAIM ON THE EIGHTH AND FOURTEENTH AMENDMENTS
## DELIBERATE INDIFFERENCE
## TO SERIOUS MEDICAL/MENTAL HEALTH NEED
## AND FAILURE TO PROVIDE
## MEDICAL/MENTAL HEALTH CARE AND TREATMENT
## (AGAINST DEFENDANT DCJ)

300.     Plaintiff bring this claim on behalf of a class, pursuant to Fed.R.Civ.P. 23(a) and 23(b)(3).

301.     The Class consists of (a) all individuals who were incarcerated at DCJ within the four years preceding the filing of the complaint (b) who, at the time of the incarceration, had been prescribed and were taking a benzodiazepine prescription and (c) who were denied their benzodiazepine prescription, or a substitute prescription, during the incarceration at DCJ.

69

302.     On information and belief, the class is so numerous that joinder of all members in not practicable. The information relating to the precise number of persons who fall within the respective classes is within the control of the Defendants.

303.     There are questions of law and fact common to the members of each class, which common questions predominate over any questions relating to individual class members. The predominant common questions are (a) whether DCJ has a policy or practice of depriving inmates of their benzodiazepine prescription without a substitute; and (b) whether such a practice constitutes a constitutional violation under the 4th and/or 8th Amendment whereby DCJ causes inmates to suffer benzodiazepine withdrawal.

304.     Plaintiff's claim is typical of the claims of the respective class members. All are based on the same factual and legal theories.

305.     Plaintiff will fairly and adequately represent the members of each class. Plaintiff has retained counsel experienced in civil rights and class litigation.

306.     A declaration of law and injunctive relief is appropriate for the members of the Class.

307.     A class action is superior for the fair and efficient adjudication of the claims of the Class, in that:

      a.   Individual actions are not economically feasible;

      b.   Members of the class are likely to be unaware of their rights;

      c.   Congress intended class actions to be an enforcement mechanism under 42 USC §1983.

**PRAYER FOR RELIEF**

WHEREFORE, for the foregoing considerations, Plaintiff S. L. requests that this Court, after a trial by jury of his peers, enter Judgment against Defendants for actual and compensatory damages, nominal damages, and exemplary or punitive damages as are proven at trial; for reasonable attorney fees, costs, and expenses incurred herein; and for such further legal and equitable relief as the Court may deem just and proper.

Dated this 4th day of December, 2018.

/s/ Tyler Ayres
Attorney for Plaintiffs